## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **MERRILL LYNCH, PIERCE, FENNER & SMITH INC.,** | **CASE NO.  1:07CV475** |
| **Plaintiff,** | |
| vs. | **JUDGE ANN ALDRICH** |
| **CHARLES BRENNAN, et al.,** | |
| **Defendants.** | **MEMORANDUM AND ORDER** |

Before the court is Merrill Lynch, Pierce, Fenner & Smith Inc.'s ("Merrill's") emergency motion for a temporary restraining order ("TRO") pursuant to Federal Rule of Civil Procedure 65.  Based upon the parties' filings, the arguments made at the February 22, 2007, hearing, and applicable law, the motion is hereby denied.

### I.  FACTUAL BACKGROUND

Merrill has filed a complaint against defendants Michael Zweig ("Zweig"), Phillip Irvin ("Irvin"), and Charles Brennan ("Brennan") (referred collective hereinafter as "defendants") for (i)breach of contract; (ii) misappropriation and misuse of trade secrets; (iii) conversion of confidential business information; (iv) breach of duty of loyalty; and (v) unfair competition.

Defendants are former employees of Merrill's Pepper Pike office.  Zweig has been working for Merrill since April of 1990; Irvin since May of 1995; and Brennan since July of 2001.  In 1998, Zweig and Irvin formed the "Zweig Group," but it appears that they were still in

the employ of Merrill. Brennan joined the Zweig Group in March of 2006. On Friday, February 16, 2007, defendants resigned from Merrill and began working at Bear Stearns & Co. ("Bear Stearns"), a competitor brokerage firm. Merrill alleges that defendants sent out soliciting information to their former clients developed while working at Merrill, in violation of various employment agreements. The accounts that defendants managed generated $3.6 million in annualized commissions in 2006.

Zweig signed a Financial Consultant Training Agreement, which states in relevant part,

> All records of Merrill Lynch, including the names and addresses of its clients are and shall remain the property of Merrill Lynch at all times during my employment with Merrill Lynch and after termination of my employment for any reason with Merrill Lynch . . . All of said records or any part of them are the sole proprietary information of Merrill Lynch and shall be treated by me as confidential information of Merrill Lynch.

(Doc. No. 1-2). Paragraph two of the same agreement states that

> In the event of termination of my services with Merrill Lynch for any reason, I will (i) not solicit, for a period of one year from the date of termination of my employment, any of the clients of Merrill Lynch whom I served or other clients of Merrill Lynch whose name became known to me while in the employ of Merrill Lynch in the office of Merrill Lynch in which I was employed, and who reside within one hundred miles of the Merrill Lynch office in which I was employed.

*Id.*

Brennan and Irvin signed a Financial Consultant Employment Agreement and Restrictive Covenants agreement, which states,

> All records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, phone numbers and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch . . . I agree not to divulge or disclose this information to any third party and under no circumstances will reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

*Id*. Paragraph two of the same agreement states,

> If at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity.

*Id*.

Additionally, these contracts contain language consenting to injunctive relief. Specifically, Zwieg's contract states "I further consent to the issuance of a temporary restraining order of a preliminary or permanent injunction to prohibit the breach of any provision of this contract, or to maintain the status quo pending the outcome of any arbitration proceeding which may be initiated." *Id.* Irvin and Brennan's contracts state in relevant part,

> In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore I consent to the issuance of a temporary restraining order or a preliminary or permanent injunction ordering: (a) that I immediately return to Merrill Lynch all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and (b) that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Merrill Lynch, in any office and in any capacity.

*Id*. Merrill also takes pains to note that the defendants signed various Privacy Policies, such as the Compliance Outline for Private Client Financial Advisors, the Guidelines for Business Conduct, and the Conflict of Interest Agreement.

Merrill alleges that the defendants violated the above agreements by removing client

information, transmitting these client lists, and using this information to solicit those Merrill clients.

## II.  DISCUSSION

**A)  Legal Standard:**

When considering a TRO, a party is entitled to injunctive relief when: 1)plaintiff has demonstrated a likelihood of success on the merits; 2)plaintiff has demonstrated it will be irreparably harmed in the absence of injunctive relief; 3)greater harm would result to plaintiff from the denial of injunctive relief than to the defendants where injunctive relief is granted; and 4)the public interest would be better served by issuing a preliminary injunction.  *See Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citation omitted).

**B)  Irreparable Harm**

Because the court finds that Merrill cannot demonstrate irreparable harm, Merrill's motion is denied.[1]  Merrill cites to cases for the proposition that the damages are incalculable. (Doc. No. 3-1 at 9.).  That is, that it is impossible to determine the number of clients who will be taken away, nor what commissions each client will generate.  Although this court found such arguments persuasive in 1998, the changed circumstances of the securities industry convinces the court that such arguments no longer merit such weight.  *Merrill Lynch v. Martin*, No. 98CV1408  (N.D. Ohio 1998).  To wit, in 2001, Merrill, along with industry peers, signed the Protocol For Broker Recruiting ("the Protocol").  In essence, the Protocol allows brokers, under

---

[1]  Because Merrill's motion fails on this prong, the court need not address the three remaining TRO elements.

certain conditions, to bring client lists with them when transferring firms.  Although Bear Stearns is not a signatory to this agreement, Merrill's signature indicates that they understand the fluid nature of the industry; brokers routinely switch firms and take their client lists with them.  By setting up such a procedure for departing brokers to take client lists, Merrill tacitly accepts that such an occurrence does not cause irreparable harm.

Additionally, Merrill cites the loss of goodwill as a source of irreparable harm, allegedly suffering a loss of customer trust and goodwill once it becomes clear that such confidential information was given to others (i.e. Bear Stearns).  The court disagrees.  Specifically, given the existence of the Protocol, it appears that Merrill and industry peers are well aware of, and content with, the idea that brokers will leave and take client lists with them.  Such an agreement significantly undercuts the notion that such behavior destroys customer goodwill.

### III.    CONCLUSION

For the aforementioned reason, Merrill's emergency motion for a temporary restraining order is denied.  Pursuant to the NASD rules, this matter will proceed to arbitration.

IT IS SO ORDERED.

                                              s/Ann Aldrich
                                              ANN ALDRICH
                                              UNITED STATES DISTRICT JUDGE

Dated: February 23, 2007